(RECOMMENDED FOR PUBLICATION)
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No: 13-48-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM** |
| | ) | **OPINION** |
| LORAN BELCHER, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

When Defendant Loran Belcher and two other companions were stopped by law enforcement during a routine traffic stop, the officers discovered an active methamphetamine laboratory underneath the place where Belcher was sitting. The government contends that the three defendants should pay restitution for the cleanup costs of that laboratory in the amount of $2,407.38. We know that the "lab" at issue was dismantled by a United States Forest Service Agent, but there is no specific information in the record justifying the details of how that cost was calculated. Consequently, Belcher objects to the amount of restitution assessed in this case. At Belcher's sentencing proceeding, neither party was prepared to present further evidence in support of their arguments concerning the restitution amount and requested additional time to brief the matter. Accordingly, the Court granted the parties' request, and their responses are presently before the Court.

**I**

This case involves six co-defendants involved in a conspiracy to manufacture methamphetamine. Defendant Belcher pled guilty to a violation of 21 U.S.C. § 846, Conspiracy

to Manufacture a Mixture or Substance Containing a Detectable Amount of Methamphetamine. [R. 282.] More specifically, Belcher's plea agreement stated that she obtained pseudophedrine and other items used to manufacture methamphetamine and provided them to others for the purpose of manufacturing methamphetamine, and that upon her return from a trip to purchase such items, a routine traffic stop revealed an active methamphetamine laboratory under Belcher's seat and methamphetamine on her person. [R. 282 at 2.] The United States claims that Belcher and several other co-defendants should be required to pay $2,407.38 as restitution for the cleanup costs associated with the methamphetamine lab found in the car where she was sitting. Defense counsel argues that the record does not support such a high amount, and that given the relatively small size of the laboratory at issue, and the lack of evidence revealing the need for specialized disposal of the chemicals or for decontamination of the vehicle or its occupants, the clean-up costs at issue here were likely negligible. [R. 294 at 3-5.] The government contends that the amount of $2,407.38 is reasonable because it represents the average cost of dismantling a methamphetamine laboratory. [R. 293 at 2.]

## II

Federal courts lack inherent power to order restitution, and may only order restitution in criminal cases when specifically authorized by statute. *United States v. Hinton*, 48 F.3d 1220, *3 (6th Cir. 1995) (unpublished decision) (citing other sources); *see also United States v. Pawlinski*, 374 F.3d 536, 540 (7th Cir. 2004). Here, it is undisputed that restitution is not only authorized but also mandated by 21 U.S.C. § 853(q) for the costs associated with cleaning up clandestine methamphetamine laboratory sites. Specifically, the statute directs the Court to order the defendant to reimburse the United States or state and local government for the costs incurred in the cleanup associated with the manufacture of methamphetamine by the defendant. 21 U.S.C.

§ 853(q). The same statute also states that restitution shall be ordered in accordance with 18 U.S.C. § 3664, which provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained . . . shall be on the attorney for the Government." 18 U.S.C. § 3664(e); *see also United States v. Hoglund*, 178 F.3d 410, 414 (6th Cir. 1999) ("The government has the burden of establishing the amount of loss"). In most cases defendants agree to the cleanup costs as part of their plea agreement. The amount set by the government undoubtedly is to the advantage of some defendants but to the disadvantage of others. Here, Defendant Belcher has taken the unusual step of putting the government to its proof on this point, and has objected to the amount of restitution set by the government. Thus, because Belcher disputes the amount of restitution, the sole issue before the Court is whether the United States has met its burden of proof in demonstrating the amount of loss.

In its response to Belcher's objection, the United States offers no direct proof in support of the proposed restitution amount. There is no statute or caselaw mandating the amount at issue. Rather, the only support referenced by the government is a website called "Center for Problem-Oriented Policing" and a DEA agent's testimony before a House Subcommittee for the United States Congress in February 2000. [R. 293 at 2.] The website discusses a wide range of problems associated with clandestine methamphetamine labs, including the challenges posed in adequately and safely cleaning them up. In particular, the site states that "[c]leaning up clandestine methamphetamine labs is an enormously complex, time-consuming and costly undertaking," and also explains the dangerous risks associated with the hazardous materials and residual chemicals involved. Michael S. Scott & Kelly Dedel, *Clandestine Methamphetamine Labs 2nd Edition No. 16* (2006), http://www.popcenter.org/problems/meth_labs/1 (last visited

3

May 6, 2015). While this supports the notion that the proposed amount of restitution at issue here is a *plausible* amount, it sheds no light on the question of whether it is the *actual* amount the defendants in this case should have to pay. The article on the website goes on to state that "[t]he average cost of cleaning up the immediate and apparent hazardous materials in an average-sized clandestine methamphetamine lab ranges from $2,500 to $10,000." *Id*. Again, this may support the contention that the proposed amount is not unreasonable, but it does not constitute evidence of actual costs incurred in this particular case.

  As for the Congressional testimony, the DEA agent testified that "the size of a clandestine laboratory can be a significant factor in the costs associated with the hazardous waste cleanup. Larger production laboratories usually have larger quantities of toxic chemicals, and therefore, more significant hazardous waste disposal charges. DEA records indicate that the average costs of cleanup for clandestine labs seized throughout Arkansas have ranged from $3,000.00 -- $9,000.00 depending on the size of the lab." *Threat to Rural Communities from Methamphetamine Production, Trafficking, and Use: Hearing before House Subcomm. on Crime of the House Comm. on the Judiciary*, 106th Cong. 2 (2000) (statement of George J. Cazenavette, DEA Special Agent in Charge, New Orleans Field Division). The government references this testimony to support its argument that the proposed amount of $2,407.38 of restitution is necessarily "a reasonable cost to assess" since it is below this range. [R. 293 at 2.] However, not only is this testimony from over fifteen years ago, but the fact that it makes the size of the lab an important distinction in determining cleanup costs further supports the notion that the government should have to provide some evidence of the specific details of the methamphetamine lab at issue in this case in order to justify the amount of proposed restitution. The fact that the amount may be reasonable in comparison to other cleanup costs around the

country does not satisfy the government's burden to provide some evidence of costs involved in this particular case.

Moreover, the very amount of $2,407.38 is so precise that it implies there is some sort of detailed calculation behind it to justify its specificity. Yet the government has not provided those calculations. The government merely states, with no citation to any authority whatsoever, that "a Congressional inquiry determined that the average cost of dismantling a methamphetamine laboratory is $2,407.38." [R. 293 at 2.] In response, defense counsel argues that because of the size and location of the lab, it was clearly small enough to be below average, and disputes the government's position that average costs should be assessed against Belcher in this matter. The Defendant's point is well taken. Importantly, all three sources discussed above which the government references in support discuss the average cost of dismantling an average lab, but the government has given no indication that the particular lab at issue here was of average size or necessitated average cleanup costs compared to that of other cleanup costs around the country. Put simply, the government cannot simply extrapolate its costs in this case to the average costs of average-sized meth labs on a national scale without any evidence specific to this particular case.

Despite defense counsel's implication that the lab at issue here was small and assumes that the cleanup costs associated with it must have been "negligible," the Court fully recognizes that the cleanup associated with almost any methamphetamine lab can potentially be very expensive, time-consuming, and even dangerous. Indeed, the website which the government references and associated DEA publications, as well as the Congressional testimony all support that conclusion. The problem for the government, however, is that some evidence of the cleanup costs associated with this specific lab are necessary. Thus far, the government has presented no circumstances from which the Court could reasonably infer that the cleanup required in this

particular case was expensive, dangerous, or time-consuming. The Court does not doubt that the cleanup at issue here *could* have cost over $2400, but some proof is still necessary before ordering defendants to pay such a precise amount.

The only specific factual support the government provides concerning the procedure and expense of cleanup in this matter is to state in the response brief that agents of the United States Forest Service conducted a traffic stop of a vehicle in which Belcher and two other co-defendants were present, and that the officers subsequently noticed a methamphetamine laboratory underneath where Belcher was sitting. The sole explanation of the subsequent "cleanup" provided by the government is as follows:

> Agent Bob O'Neill of the United States Forest Service was present at the traffic stop and identified the item as an active methamphetamine laboratory. Agent O'Neill obtained samples and then dismantled the laboratory.

[R. 293 at 1.] No further detail is provided as to what measures Agent O'Neill took in obtaining the samples, how he "dismantled" the laboratory, how long it took, what procedures were followed, or what expenses were incurred. Without further proof that the measures taken justify restitution in the amount of $2,407.38, the government has failed to meet its burden on this issue.

Finally, the Court is aware of the usual 90-day deadline for ordering restitution under 18 U.S.C. § 3664 ("MVRA"), but also notes that under *Dolan v. United States*, 560 U.S. 605, the sentencing court retains some flexibility in situations such as this where the Court must make a final determination about victims' losses, and in such cases the Court may still order restitution after the MVRA 90-day deadline when it makes clear before that date that it intends to order restitution in the future. *Dolan v. United States*, 560 U.S. 605, 611 (2010). Here, the Court intends to order restitution if and when the government adequately justifies the amount sought.

The Court also notes that its final ruling with regard to Belcher's objection will likely impact the restitution ordered for the other two co-defendants who were sentenced separately from her, and acknowledges that given the circumstances the same flexibility described in *Dolan* will apply to those sentences as well.  *See* 560 U.S. 605, 611.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** that **within ten (10) days** of the entry of this Order the United States **SHALL provide** the Court with specific evidence supporting the proposed restitution amount as explained above.  Such evidence could include information such as: the procedures and methods used in dismantling the methamphetamine lab at issue, the size of the lab, what types of hazardous waste were produced in the lab, how any hazardous waste materials were handled and the disposal methods used, and whether the DEA was contacted or involved in the cleanup process.  If applicable, the United States may also provide evidence justifying a lesser amount of restitution, or, if it has no evidence justifying a particular amount of restitution, it may waive its right to seek restitution in this matter.

This 7th day of May, 2015.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge